OPINION
 

 SWEET, District Judge.
 

 Plaintiff Best Cellars, Inc. (“Best Cellars”) has moved for a preliminary injunction, pursuant to Rule 65, Fed.R.Civ.P., to enjoin defendants Grape Finds at Dupont, Inc. (“GFDI”), Grape Finds, Inc. (“GFI” and, together with GFDI, “Grape Finds”), H. Douglas Campbell III (“Campbell”), John B. Mazur (“Mazur”), Michael Green (“Green”), and Hornall Anderson Design Works, Inc. (“Hornall Anderson”) (collectively, “Defendants”) from infringing on various intellectual property rights claimed by Best Cellars under the Lanham Act, 15 U.S.C. § 1125, the Copyright Act, 17 U.S.C. § 101
 
 et seq.,
 
 and the New York common law of unfair competition. Defendants have moved, pursuant to Rule 12(b)(2), Fed.R.Civ.P., to dismiss the action for lack of personal jurisdiction.
 

 This action presents difficult issues, particularly with respect to the law of trade dress protection, itself a complex and shifting field of judicial interpretation.
 
 See, e.g., Wal-Mart Stores, Inc. v. Samara Bros.,
 
 — U.S. -, 120 S.Ct. 1339, — L.Ed.2d-(2000). The action involves a unique concept, the retail sale of wine by taste, captured and exemplified in the particular trade dress of the Best Cellars stores. It presents the tension between the protection of certain intellectual property and free and open competition. Under the particular facts of this case, the balance tips in favor of protection.
 

 A three-day hearing, at which the parties were well-represented by counsel, established facts sufficient to find, for purposes of granting preliminary injunctive relief, that Grape Finds copied protectible elements of Best Cellars’ trade dress, engaged in unfair competition, and infringed on Best Cellars’ copyrighted brochure. By contrast, the facts established are insufficient to warrant granting of injunctive relief on Best Cellars’ claims of trade dress dilution or breach of confidentiality.
 

 The Parties
 

 Best Cellars, a retail wine seller, is a New York corporation with its principal place of business in Manhattan and retail stores in Manhattan, Brookline, Massachusetts, and Seattle, Washington.
 

 GFDI is a Washington, D.C. corporation with its principal place of business in Washington, D.C. It is a retail wine seller servicing the Washington, D.C. metropolitan area.
 

 GFI is a Maryland corporation with its principal place of business in Washington, D.C. GFI is the parent corporation of, and owns 100% of, GFDI.
 

 
 *435
 
 Mazur, a Virginia resident, is president, a director, and a principal shareholder of Grape Finds.
 

 Campbell, a Washington, D.C. resident, is vice-president, a director, and a principal shareholder of Grape Finds.
 

 Green is a current vice-president and shareholder of Grape Finds and a co-founder, former partner in, and current shareholder of Best Cellars. He is a resident of Washington, D.C., though he maintains an apartment in Manhattan.
 

 Hornall Anderson, a design firm, is a Washington State corporation with its principal place of business in Seattle.
 

 Prior Proceedings
 

 Best Cellars filed its original complaint in this action on December 21, 1999, and on December 22, by order to show cause, sought a preliminary injunction.
 

 On December 23, 1999, Grape Finds, Campbell, and Mazur served on Best Cellars their motion to dismiss for lack of personal jurisdiction and alternative motion to transfer for improper venue.
 

 Best Cellars filed its First Amended Complaint (the “Complaint”) on December 27, 1999, and a Second Amended Complaint on January 11, 2000.
 

 Also on December 27, 1999, the Honorable Richard M. Berman, sitting in Part I, granted jurisdictional and limited merits discovery.
 

 Green filed his motion to dismiss for lack of personal jurisdiction on January 13, 2000.
 

 Grape Finds, Campbell, and Mazur filed a motion to strike Best Cellars’ Second Amended Complaint on January 19, and by letter dated January 20, 2000, Best Cellars indicated it would withdraw its Second Amended Complaint.
 

 On January 26, 27, and 28, 2000, this Court held an evidentiary hearing on the preliminary injunction. Additional briefs were filed and concluding oral argument was held on February 14, 2000, at which point the motions were deemed fully briefed.
 

 Findings of Fact
 

 Best Cellars operates retail wine stores in New York, New York, Brookline, Massachusetts, and Seattle, Washington. The company was founded by Joshua Wesson (“Wesson”), Green, and Richard Marmet (“Marmet”).
 

 Wesson is an internationally recognized wine expert who has worked in the field since 1979. He has received national and international awards as a sommelier. For several years, he worked for top New York and Boston restaurants, helping to select their wine lists. In 1986, he started a wine consulting business, the clients of which included both top restaurants and other businesses. Throughout this period, he also wrote numerous articles on wine. In 1989, he co-authored, with David Rosen-garten, an award-winning book entitled “Red Wine With Fish,” which discussed the concept of “wine by style,” i.e., categorizing wine by taste and weight, rather than by grape type or place of origin.
 

 Wesson continued to promote the “wine by style” concept through additional writings and frequent speaking engagements, bn the early 1990’s, he began to think about developing a new kind of retail wine store where people who knew little or nothing about wine could feel as comfortable when shopping as wine connoisseurs, and in which the “wine by style” concept could be implemented. The name “Best Cellars” came to him in 1993.
 

 In 1994 or 1995, Wesson began to include Green, who at the time was working at Acker Merrall & Condit, an upscale New York retail wine store, in the discussions for the new store. In 1995, Wesson met Marmet, a practicing lawyer who had written all of the wine sections for Food and Wine magazine’s cookbooks. Wesson, Green, and Marmet then set out to make the Best Cellars concept a reality.
 

 Wesson, with the input of Marmet and Green, spent considerable time before and
 
 *436
 
 during the design phase of the first Best Cellars store refining the “wine by style” concept. Wesson eventually reduced the “world of wine” to eight taste categories: sparkling wines, light-, medium-, and full-bodied white wines, light-, medium-, and full-bodied red wines, and dessert wines. For each category, he selected, after a long winnowing process, a single word to serve as a “primary descriptor.” Words which were “runners-up” for each category became “secondary descriptors.” The eight primary descriptors are: “fizzy” (for sparkling wine), “fresh” (light-bodied white), “soft” (medium-bodied white), “luscious” (full-bodied white), “juicy” (light-bodied red), “smooth” (medium-bodied red), “big” (full-bodied red), and “sweet” (dessert wine). This conceptual reduction is the heart of the Best Cellars “system.”
 

 A principal reason Wesson reduced the world of wine to eight taste categories was in order to demystify wine for casual, non-connoisseur purchasers who might be intimidated purchasing wine in a traditional wine store, where wines are customarily organized by grape type and place of origin. To the uninitiated, of course, grape type and place of origin provide no ready clues to a wine’s flavor. In addition, the vast number of grape types and places of origin could easily overwhelm a novice. For these same reasons, Wesson also decided to limit the number of wines for sale at Best Cellars to approximately one hundred, and to price those wines at ten dollars or less. It was also decided to offer fifteen or twenty more expensive wines for “special occasions.”
 

 The co-founders consulted John Alison, an intellectual property attorney at Finnegan Henderson, a Washington, D.C. firm, for advice on how to protect what they were developing. They also looked for an architect, settling in April 1996, on the Rockwell Group (“Rockwell”), known for its designs of prominent restaurants. The lead architect from Rockwell for the Best Cellars project was Samuel Houston Trim-ble (“Trimble”). Trimble was asked to create an “anti-wine store,” or, ideally, “not a wine store at all,” as part of the effort to “reinvent the way that wine was retailed.” (Tr. 18.) The partners also searched for a graphic design firm and ultimately settled on Hornall Anderson, after the bulk of Trimble’s design work had been completed.
 

 Hornall Anderson and Rockwell were provided with copies of Best Cellars’ marketing and business plans. Hornall Anderson also signed a confidentiality agreement with Best Cellars.
 
 [1]
 

 Wesson and Trimble visited many wine stores in order to get ideas “about what not to do” (Tr. .286). Trimble and other architects from Rockwell then developed between six and eight different architectural interpretations of the ideas supplied to them by Wesson, Marmet, and Green. The co-founders met with Rockwell on a regular basis and eventually settled on the final design. Numerous sketches of feasible, but rejected, design ideas were introduced into evidence at the hearing. These ideas included many different designs for wine racks and other ways to display the merchandise.
 

 Rockwell also consulted on the Seattle and Brookline stores.
 

 The design for the first Best Cellars retail store — on the Upper East Side in Manhattan — evolved to contain the following elements:
 

 For each of the eight taste categories in the Best Cellars system, Hornall Anderson came up with a corresponding color and a graphic image (an “icon-identifier”) both to evoke and to reinforce the sensory associations of each category. Thus, for example, the “fizzy” category (sparkling wines) is represented by an ice-blue color and an icon suggesting bubbles rising, while the “fresh” category (light-bodied white wines) is represented by a lime-green color and
 
 *437
 
 an icon suggesting a slice of citrus fruit. The icon-identifiers, which are computer-manipulated drawings, are also meant to suggest wine stains. Before settling on the iconographic drawings, Hornall Anderson discussed the use of computer-enhanced photographs with Best Cellars. It was decided to reserve the use of photographic images for holiday and other special promotions.
 

 The Rockwell architectural design is simple, elegant, and striking. The wines are primarily displayed along the perimeter walls of the store. A display bottle for each wine stands upright on a stainless-steel wire pedestal slightly above eye-level, so that the label on the bottle may be viewed by the customer. Under each display bottle, at eye-level, is a “shelf-talker”: a 4”x4” info card, designed by Hornall Anderson, providing the name of the wine, its vintage, a five- or six-line description of its taste, the type of grape from which it is made, its place of origin, a “FYI” blurb (often mentioning foods which the wine would complement), and its price.
 
 [2]
 
 The top third of the shelf-talker has a color strip corresponding to the Best Cellars taste category to which the wine belongs.
 

 Below each display bottle and its shelf-talker, nine additional bottles of the same wine are stored in a vertically arrayed racking system. The bottles in the vertical array lie horizontally in translucent Plexiglas tubes. The tubes are masked by a wall of light wood (American Sycamore) through which the individual bottles protrude slightly. Each of the openings through which the bottles protrude is trimmed with a thin ring of stainless steel. Because the perimeter walls of the store are built out so that they are flush with the “walls” of the racking system, and because the perimeter walls are built of the same light wood, it creates the impression that the bottles are literally stored in cubbyholes in the walls of the store.
 

 The racking system, which is patented by Marmet, Wesson, and Trimble, is lit from behind, which causes the bottles to glow but does not harm the wine. The bottles can be placed in the tubes so that either the cork end or the bottom of the bottle is visible. Both methods of display are utilized, although the bottom method is more prevalent. The overall effect, which is quite striking, is of rows and rows of glowing bottles in the walls of the store. The wine is thus a decorative element.
 

 Beneath the wall racks are drawers for storing additional bottles of wine. The drawers also serve a visual aesthetic function, providing a border strip between the racks and the floor, similar to baseboard molding or wainscotting. In addition, if the racks were to extend all the way to the floor, customers would have to stoop excessively to retrieve the lowest bottles. Thus, there is also an ergonomic aspect to the design.
 

 The “walls of wine” do not extend along the entire perimeter of the store. The wall facing the street is glass, as is typical for a retail store, in order to attract passing foot traffic. The back wall has a limited amount of traditional “open shelving,” i.e., shelves on which the non-display bottles of wine stand upright underneath the display bottles. In addition, the cash wrap
 
 [3]
 
 is recessed into the back wall, and to the right of the cash wrap (from the perspective of a customer looking into the store from the street entrance), there is a large placard on the wall explaining the Best Cellars system through the use of the primary and secondary descriptors, the colors, and the icon identifiers for the eight categories.
 

 
 *438
 
 Above the wall racks are large signs, designed by Hornall Anderson, with the name of each taste category, together with its assigned color and icon-identifier. The categories are arranged in the following order as one moves clockwise around the store from the doorway: fizzy, fresh, soft, luscious, juicy, smooth, big, and sweet (corresponding to sparkling, light-, medium-, and full-bodied white, light-, medium-, and full-bodied red, and dessert wine, respectively). The wines displayed beneath each individual sign belong to the category identified by the sign. Also, affixed to each bottle of wine is a label with the Best Cellars name and logo, and the color, icon-identifier, and name of the category into which the wine has been classified.
 

 Of course, the perimeter fixtures — the wine racks, the signs, and the storage drawers — while dominant in the design, are not its only elements. There is a plaster ceiling with track lighting, and a poured concrete floor. The wall behind the cash wrap is a burgundy-colored plaster with copper powder mixed in. The store has no fixed aisles, but in the floor space is a wooden table with benches, used for displays and wine tastings, and a mobile cart, designed by Rockwell, with a stove and cook top for food preparation to accompany the wine tastings.
 

 The dominant architectural material in the store is light wood. Stainless steel is used as a highlight: in the wire pedestals holding the display bottles, in the rings circling the holes in the racking system, and as trim on the cash wrap.
 

 Certain aspects of the Seattle and Brookline stores differ from the New York store. Of these aspects, some were deliberate changes by Best Cellars, i.e., improvements. Others were dictated by the idiosyncracies of the store locations, lease terms, and local zoning laws.
 

 Among the “improvements”: the category signs posted around the store were doubled in size, changed in shape from square to rectangular and given a three-dimensional concave look in which the sign bows out from the wall, the texture was removed from the back of the signs, the typography was modified, and the colors were changed slightly in appearance (possibly due to the use of a different material); the category order was slightly adjusted by placing “fizzy” wines at the end rather than at the beginning, and the layout of the categories in the stores was reversed so that it runs in counter-clockwise fashion to reflect market research suggesting that customers normally travel in a counter-clockwise pattern in a retail store environment; a refrigerator was placed in one wall in order that certain wines could be kept chilled, with the added sign “cool” placed above the refrigerator, although that sign was subsequently removed, and the “fizzy” sign shifted so it is now over the refrigerator in the Seattle store; the cook’s table in the Seattle store is different and was not designed by Rockwell; and the cash wrap is in an “island” in the center of the store.
 

 Among the changes dictated by “local” factors: the Seattle and Brookline stores do not have poured concrete floors; the ceilings of the stores differ; and the exterior of the Brookline store has a trellis or curved awning, while the Seattle store has a rectangular awning.
 

 Many of the design elements described above are not found in any other retail wine store, with the exception of Grape Finds.' On average, a retail wine store ip the U.S. carries about 500 different kinds of wine, displayed not only along the perimeter but throughout the floor space by the use of freestanding or built-in shelves. Although many wine stores use shelf talkers, apparently only one other store, Nancy’s, in New York, has a shelf-talker for each type of wine displayed, and even the shelf-talkers at Nancy’s differ significantly from those at Best Cellars: they are handwritten, and the formatting of the information (and even the nature of the information) changes from shelf-talker to shelf-talker. No other store has a uniform dis
 
 *439
 
 play of shelf-talkers at eye level. No store arranges wine by taste category, along the perimeter, backlit in vertical arrays of nine, with storage cabinets underneath.
 

 Other stores do, however, merchandise wine by displaying a single upright bottle, with additional bottles of the same wine stored in racks or open shelving beneath the display bottle. Light wood is a common material in retail stores generally and has been used in retail wine stores.
 

 The concept of categorizing wine by taste and style, while it had not previously been utilized in any retail wine store, has been utilized by various writers of books on wine. These writers use differing numbers of categories. For example, Serena Sutcliffe, author of “The Wine Handbook,” uses 14 categories. Fiona Beckett uses 12 categories in one book and IB in another.
 

 The Manhattan Best Cellars store opened in November 1996. It has received local, national, and international press coverage from a wide variety of general interest and wine industry publications, including Harper’s, BusinessWeek, the Wall Street Journal, Food and Wine, and Wine and Spirits. The store has also been highlighted on local and national television programs, during which Wesson or other Best Cellars employees have been interviewed. An article in Wine Business Monthly, a publication serving the wine industry, stated that “Best Cellars is unlike any wine store that ever existed on Main Street, in cyberspace, or anywhere else.”
 

 Rockwell won numerous awards for its architectural design of the store, including one for Best Retail Environment of the Year. Hornall Anderson won numerous awards as well. Wesson won the Golden Grape Award, for retail innovator of the year, from the wine industry.
 

 Green, who had signed a confidentiality agreement with Best Cellars, was, in addition to being a co-founder, responsible for managing the New York store. However, his employment was terminated in February 1997, shortly after the store opened.
 

 As part of its plan for expansion, Best Cellars looked for a Washington, D.C. location for over two years. It was notified by Bruce Frankel, its D.C. real estate broker, that a “knock-off store (Grape Finds) was moving into a space at Dupont Circle. It was also notified regarding Grape Finds by Andrew Stenzler, CEO of Xando, a licensee of the Best Cellars’ classification system. Best Cellars has a license permitting Xando to sell wine under the Best Cellars system, but the written license is limited to Xando’s stores in New York. A verbal agreement was in place to extend the use to Xando’s stores nationally. Use of the Best Cellars system in Xando’s Washington D.C. store began on December 7, 1999, i.e., four days after the opening of the Grape Finds store.
 

 At some point prior to October 14, 1998, Best Cellars terminated Hornall Anderson (before the opening of the Brookline store, in October 1998) due to disagreement over how to improve Best Cellars’ trade dress.
 

 The Grape Finds story begins with Ma-zur, who attended Columbia Business School in New York from 1996 through May 1998, when he received an M.B.A. Mazur wanted to run his own business, and he had an interest in wine. While at Columbia, he discovered the Best Cellars New York store, which he has visited at least ten times. Mazur has also visited the Best Cellars web site between 100 and 200 times, and has downloaded hundreds of articles about Best Cellars from the Lexis-Nexis database.
 

 Mazur had studied and admired Starbucks’ phenomenally successful remer-chandising of coffee retailing and saw in the Best Cellars model a way to do a similar remerchandising of wine retailing. Seeking to capitalize on Best Cellars’ innovations, Mazur began to draft a business plan, cutting and pasting descriptions of the Best Cellars concept and design from the articles downloaded from Lexis-Nexis and substituting “Grape Finds” for “Best Cellars.”
 

 
 *440
 
 After graduation, Mazur moved to the Washington, D.C. metropolitan area and began to implement a plan to open a Grape Finds retail wine store using the Best Cellars conceptual model. Mazur was assisted in his enterprise by his father, Jack Mazur, from whom at least some business advice and some funding came. Jack Ma-zur is a former attorney who surrendered his license to practice law in conjunction with a lawsuit initiated against him for fraud.
 

 On March 15, 1999, GFI was incorporated,
 
 [4]
 
 and on March 24, 1999, GFI executed a contract to purchase a liquor store in the Dupont Circle area of Washington, D.C. Also during mid-March, Mazur contacted Theodore Adamstein (“Adamstein”), a principal at the architectural firm of Adamstein and Demietrou (“A
 
 &
 
 D”), to discuss the possibility of A & D designing the store. At the first meeting, when Ma-zur described his concept for Grape Finds, Adamstein remarked that the concept was similar to Best Cellars. Adamstein testified that “[i]t was an easy leap” from Mazur’s description of Grape Finds to the thought of Best Cellars, “as easy as [if] they were describing hamburgers and I thought of McDonald’s.” (Tr. 339.) Adamstein was familiar with the Best Cellars design because he had seen photographs of it in numerous design publications.
 

 A & D was subsequently hired to design the store, and Jack Mazur participated in the hiring negotiations. As part of the design research, Adamstein was paid to go to New York and visit the Best Cellars store on April 20, 1999. Adamstein testified that he visited many wine stores in New York on that trip. He did not, however, identify any other than Best Cellars, and he acknowledged that he took the train to New York, arrived at Penn Station, visited Ruby Foo’s, a restaurant on the Upper West Side also designed by Trimble and Rockwell, and then went to Best Cellars, which is on the Upper East Side. For the trip, Adamstein only turned in for reimbursement three taxi receipts. Three cab rides would take him from Penn Station to Ruby Foo’s, then to Best Cellars, then back to Penn Station. Adam-stein testified that he misplaced the other receipts and that he regularly does so, but this testimony is not entirely credible. Mazur testified that he directed Adamstein to visit the Best Cellars New York store, while Adamstein testified that he proposed the trip to Mazur. Adamstein did not make trips to any cities other than New York to look at retail wine stores. While he did look at stores in Washington, D.C., the logical inference from the testimony is that Grape Finds sent Adamstein to New York in order to copy elements of the Best Cellars design.
 

 Notwithstanding their self-serving and less-than-credible testimony, Mazur, Jack Mazur (and through them, Grape Finds), and Adamstein had a “meeting of the minds” in March 1999
 
 at
 
 which it was decided that Grape Finds would seek to appropriate the look and feel of Best Cellars’ stores. In furtherance of this conspiracy, Adamstein was sent to New York to view the Best Cellars store in order to copy elements of the trade dress.
 

 Adamstein became an investor in Grape Finds. He is currently a five percent owner, though plans are to give him options which would increase his percentage, ultimately, to ten percent.
 

 In the process of developing the architectural design for the Grape Finds store, A
 
 &
 
 D had brainstorming sessions through which, Adamstein testified, sketches were made containing numerous varying ideas equivalent to those produced in Rockwell’s sketches. (Adamstein was shown the Rockwell sketches while on the witness stand.) Not one of these purported preliminary A & D sketches was. introduced into evidence, however, in contrast to the
 
 *441
 
 Rockwell preliminary sketches. Adam-stein was not an entirely credible witness. It is a logical inference that no such brainstorming sessions were held and that the process by which A & D arrived at its design — in particular, the wall display— included copying the design of Best Cellars.
 

 A & D presented its design to Grape Finds on May 12, 1999. The design incorporated images from “the world of wine”: the vineyards where the grapes are grown, the production process, the cellars used in the aging process, and the enjoyment of drinking wine.
 

 Mazur began to search for a wine buyer in April, 1999. In May, 1999, Mazur called Green in New York, inviting him to come to Washington at Mazur’s expense, which Green did on May 27. On July 20, 1999, Mazur formally offered Green a job. Green accepted the offer to become an employee and principal of Grape Finds. Although Green had not been an employee of Best Cellars since February, 1997, he still held shares in Best Cellars. In 1999, Wesson and Marmet held unsuccessful negotiations with Green to repurchase those shares. Also in 1999, Green attempted to be released from his confidentiality agreement. Wesson and Marmet through a letter issued on September 30, 1999, refused to do so. On June 6, 1999, Green faxed Mazur a copy of his Best Cellars’ employment agreement and an outline of the initial distribution of shares in Best Cellars. Also included were materials from the Best Cellars private placement memorandum describing pricing and valuation, material which Wesson and Marmet regarded as confidential. Green also faxed to Mazur a copy of Best Cellars’ New York liquor license application.
 

 Mazur contacted Campbell toward the end of April 1999. Campbell had also received an M.B.A. from Columbia at the same time as Mazur. Campbell had previously told Mazur that he was interested in the wine business. On May 20, 1999, Ma-zur and Campbell met in Baltimore and agreed to go into Grape Finds together. From that point forward, Campbell was involved, although he was not brought in as a partner until July 1999.
 

 Hornall Anderson was engaged to do the graphic design work for Grape Finds. Mazur had been impressed with their work for Best Cellars, Starbucks, Jamba Juice, and other retailers. At the initial meeting in Seattle on June 1,1999, at which Mazur, Jack Mazur, and Adamstein were in attendance, Jack Anderson stated that Hor-nall Anderson had no conflict of interest working for Grape Finds, notwithstanding its prior work for Best Cellars. Anderson did not mention that Hornall Anderson had signed a confidentiality agreement with Best Cellars.
 

 Jack Anderson also introduced the Grape Finds representatives to Pamela Mason Davey (“Davey”), a professional co-pyrighter, who was hired to create Grape Finds’ wine categories and descriptions.
 

 Mazur, Campbell, Jack Mazur, Adam-stein, and Green met at the Four Seasons Hotel in Washington, D.C. on July 3, 1999 to discuss the creation of Grape Finds. In a document prepared for that meeting, a partial national rollout plan was indicated in which Grape Finds stores would be opened in regions in Atlanta, Chicago, and New York. Mazur testified that these “were just examples of possible markets.” Yet Mazur admits having “talked about New York,” and Jack Mazur, in a handwritten note, indicated an allocation of $400,000 for the opening of a store on Manhattan’s Upper West Side. Moreover, when questioned about his deposition testimony, Mazur admitted to having “aspirations” of opening a wine store in New York.
 

 At the July 3, 1999 Four Seasons meeting, thirty minutes was scheduled for a presentation by Green entitled, “The Best Cellars Model and Lessons Learned,” although Mazur testified that the presentation never took place, the meeting having
 
 *442
 
 taken a less formal turn from the beginning, i.e., they didn’t stick to the agenda.
 

 Green and Campbell worked on the Grape Finds website, which contains material substantially similar to material on the Best Cellars website and in the Best Cellars promotional materials, including its brochure. Campbell has visited the Best Cellars New York store at least three times, including after beginning to work for Grape Finds.
 

 Mazur knew that Best Cellars was seeking to open a store in Washington, D.C., because he was told that fact by real estate agents who were engaged to find a retail space for Grape Finds.
 

 Design work continued on the Grape Finds store through September 1999. The store opened on December 3,1999.
 

 The leased space is narrow and deep, with one large window looking out onto the street. The exterior of the store has a curved awning above the window, which echoes the vaulted ceiling inside the store. The echo is continued with a long, curved door handle. A purple blade sign “slices” through the awning. The Grape Finds logo bears no resemblance to the Best Cellars logo.
 

 Inside, there are many marked similarities to the Best Cellars store. First, the display is organized according to eight taste categories: CRISPfinds, MELLOW-finds, RICHfinds, FRUITYfinds, SMOOTHfinds, BOLDfinds, BUBBLY-finds, and SWEETfinds, corresponding to light-, medium-, and full-bodied whites, light-, medium-, and full-bodied reds, sparkling, and dessert wines (i.e., the same eight categories in the Best Cellars classification system).
 
 [5]
 

 Mazur admitted that he copied the Best Cellars category system. Moreover, many of the Grape Finds primary and secondary descriptors, although purportedly created by Davey, were copied from the primary and secondary descriptors used by Best Cellars, although the words were rearranged slightly. In many cases, words among the Best Cellars secondary descriptors appear as primary descriptors in the Grape Finds system, while Best Cellars’ primary descriptors appear among Grape Finds’ secondary descriptors.
 

 As with Best Cellars, Grape Finds has assigned to each taste category a corresponding color and icon-identifier, likewise designed by Hornall Anderson. The categories are likewise arranged in the store in systematic order. There are approximately 100 value-priced wines displayed around the perimeter of the store. Most significantly, each display wine is placed slightly above eye-level, on a stainless steel pedestal held in place by stainless steel wire. At eye-level, directly underneath the display bottle, is a square shelf-talker, formatted, once again, by Hornall Anderson, containing almost the identical set of information as the Best Cellars shelf talkers. Under each Grape Finds shelf-talker, nine bottles are horizontally stored in a stainless steel rack. The bottles are held in stainless-steel cradles lined with cork to protect the bottles. There is no “wall” concealing the bottles as there is in the Best Cellars stores, yet the effect of the nine-bottle vertical array wrapping around the perimeter of the store gives the same design feel of a “wall of wine.” Moreover, lights above the racks are directed down; much of this light bounces against the wall behind the racks, thereby indirectly back-lighting the bottles and causing them to glow. As in Best Cellars, beneath the racks are storage cabinets, creating the same visual look of an equivalent to baseboard molding or wainscotting.
 

 On the walls above the bottle racks, around the perimeter of the store, as in Best Cellars’ stores, are large signs denoting the categories. While the signs were created as a continuous thirty-foot-long
 
 *443
 
 computer-enhanced photographic mural, the presence of vertical stainless-steel blades (which divide the category sections), and the need to chop the mural into at least three sections (one continuous section along the left wall (from the perspective of a customer looking into the store from the doorway), and two sections along the right wall, broken up by the cash wrap, above which is a color-coded placard explaining the Grape Finds system) reduces the sense of a continuous mural and makes it more similar to the Best Cellars wall signs.
 

 Each mural section corresponds to, and serves to identify, one of the eight categories in the Grape Finds system. Thus, each section has a unique, computer-enhanced photograph of wine swirling in a glass, the title of the category (e.g., “MEL-LOWfinds,” “RICHfinds”), and a corresponding color palette.
 

 The combination of these visual elements — color-coded, iconographic wall signs identifying taste categories, single display bottles on stainless-steel wire pedestals along the store perimeter, identical color-coded textually formatted square shelf talkers below the display bottles, vertical arrays of nine glowing bottles stacked horizontally, and a strip of cabinets or drawers between the wine racks and the floor — dominates the overall look of both the Best Cellars and the Grape Finds stores.
 

 There are differences between the two stores. The Grape Finds store has a vaulted ceiling, meant to evoke a wine cellar. It is a prominent design feature. The floor of the store is cork. There are eleven mobile boxes in the store which can be used as seats, for display, and for storage of additional cases of wine. The boxes are arranged in varying ways on the store floor.
 

 There is an alcove space at the back of the store where a wooden table and several chairs are located for wine tastings. In the alcove there is also traditional shelving with smoked glass panels. Grape Finds does not have a mobile cart for food preparation.
 

 Stainless steel is more prominent in the Grape Finds design. As mentioned, there are stainless steel blades running from floor to ceiling, dividing the categories. On each blade is written the primary and the secondary descriptors for the Grape Finds category marked off by that blade.
 

 The cash wrap is on wheels, has a linoleum top, has shelves along the front and top, is curved, and is finished with metal. It is located at the middle of one of the long walls.
 

 There is no burgundy wall in the Grape Finds store.
 

 The layout of the Grape Finds store resembles a wine bottle, though Adamstein testified that this was more happenstance based on the configuration of the lease space than deliberate design.
 

 Mazur, Campbell, and Green worked on the Grape Finds web site, and created the in-store brochure. The original brochure has since been replaced by a new brochure. Many descriptive phrases on the web site and in the original brochure are substantially similar to the Best Cellars in-store brochure, although the phrases do not appear in the same order or layout in the Grape Finds materials as they are found in the Best Cellars brochure. For example, the Best Cellars brochure states, “Welcome to Best Cellars, a completely new kind of wine store,” while the Grape Finds web site states “Grape Finds is a completely new type of wine-store,” and the Grape Finds in-store brochure states “Welcome to Grape Finds, a completely new way to shop for wine!” Again, the Best Cellars brochure states “We’ve tried to remove any obstacles that could stand between you and your enjoyment of wine,” while the Grape Finds web site states “Grape Finds ... aims to remove many of the obstacles between people and their enjoyment of wine.” There are numerous other examples of virtual word-for-word similarity.
 

 
 *444
 
 Grape Finds had access to the Best Cellars brochure. The new Grape Finds brochure is not substantially similar to the Best Cellars brochure.
 
 [6]
 

 Although Mazur testified that he did not intend to copy the Best Cellars trade dress or brochure, Mazur is not a credible witness. Among the incidents which came to light at the hearing giving credence to this conclusion are:
 

 (1) Mazur sent an e-mail to Best Cellars on November 29, 1999° to congratulate them on the opening of the Seattle store in October 1999. He represented that he was from New York, although at the time he had been living in Washington, D.C. for a year and a half. When asked at the hearing why he had said he was from New York, he testified that he often made that mistake, since he had lived in New York during graduate school. Yet Mazur had been living in Washington, D.C. since graduation for nearly as long as he had lived in New York.
 

 (2) Mazur admitted in his testimony at the hearing that much of the material on the Grape Finds web site was substantially similar to material on the Best Cellars web site and in other writings on Best Cellars. Mazur denied, however, that he directly copied anything, stating instead that because he had seen the Best Cellars’ materials so many times he could essentially sit down and compose from memory.
 

 (3) Mazur admitted that the section of the Grape Finds private placement memorandum entitled “Store Design” was almost entirely created by cutting and pasting sentences from articles written about Best Cellars. Mazur therefore knew this information was not confidential, but nevertheless indicated that it was confidential during discovery prior to the hearing, which prevented counsel for Best Cellars from being able to show the section to Wesson and Marmet until this Court ordered otherwise. Mazur claimed he only marked it as confidential because he had to make these decisions very late at night, under pressure from his attorneys. Again, this is not credible. Large sections of the private placement memorandum were not marked confidential. Mazur knew the “Store Design” section was not confidential. Mazur also knew that if Wesson and Marmet saw the Store Design section, they would recognize Mazur’s plagiarism.
 

 (4) Mazur, in a deposition taken prior to the hearing, testified that he downloaded materials from the Best Cellars website. At the hearing, however, he denied that he ever downloaded materials until confronted with his deposition testimony, at which point he attempted to clarify his answer by stating that he “printed out” materials.
 

 (5) Mazur also testified that the design for the store was unique, and that one of the things he did to make sure it was unique was to consult with counsel. However, the opinion of counsel, Blank Rome, was dated November 1, 1999, after the designs for the store were complete. By contrast, Adamstein testified that Mazur had assured him that counsel had been consulted “from the beginning.”
 

 CONCLUSIONS OF LAW
 

 I.
 
 Jurisdiction and Venue
 

 A.
 
 Jurisdiction
 

 In a federal question case where, as here, defendants are not residents of the forum state, personal jurisdiction over the non-resident defendants is determined by looking to the law of the jurisdiction in which the federal court sits.
 
 See Bensusan Restaurant Corp. v. King,
 
 126 F.3d 25, 27 (2d Cir.1997). Thus, the Court must determine whether New York law provides a basis for exercising personal jurisdiction over the defendants.
 
 See id.
 
 In addition, if jurisdiction is found to exist under New York law, the Court must determine whether the exercise of such jurisdiction comports with federal standards of due process.
 
 See Bank Brussels Lambert v.
 
 
 *445
 

 Fiddler Gonzalez & Rodriguez,
 
 171 F.3d 779, 784 (2d Cir.1999);
 
 Bensusan,
 
 126 F.3d at 27.
 

 1.
 
 Jurisdiction Under New York Law
 

 No defendant resides in New York.
 
 [7]
 
 Best Cellars maintains, however, that the Court has jurisdiction over the defendants pursuant to New York’s long-arm statute, N.Y. C.P.L.R. § 302(a), which provides in pertinent part:
 

 As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domieiliary ... who in person or through an agent:
 

 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or
 

 2. commits a tortious act within the state ...; or
 

 3. commits a tortious act without the state causing injury to person or property within the state, ... if he
 

 (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
 

 (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce....
 

 N.Y. C.P.L.R. § 302(a) (McKinney 1990). “Section 302(a) does not extend New York’s long-arm jurisdiction to the full extent permitted by the Constitution.”
 
 Levi-sohn, Lerner, Berger & Langsam v. Medical Taping Sys., Inc.,
 
 10 F.Supp.2d 334, 339 (S.D.N.Y.1998) (citing cases).
 

 The jurisdictional test must be met for each cause of action asserted.
 
 See
 
 N.Y. C.P.L.R. § 302(c).
 

 a.
 
 302(a)(1)
 

 Both Green and Hornall Anderson contracted with Best Cellars to transact business and supply services within New York. In connection with doing so, Green and Hornall Anderson signed confidentiality agreements with Best Cellars. The cause of action for breach of confidentiality arises from these contracts and thus jurisdiction over Green and Hornall Anderson with respect to that single cause of action is appropriate.
 

 b.
 
 302(a)(2)
 

 Section 302(a)(2) requires a non-resident domiciliary to have purposely committed a tortious act while he or she — or his or her agent — is physically present in New York State.
 
 See Bensusan,
 
 126 F.3d at 28-29. An “articulable nexus” must also exist between the act and the claim asserted.
 
 McGowan v. Smith, 52
 
 N.Y.2d 268, 272, 437 N.Y.S.2d 643, 645, 419 N.E.2d 321, 323 (1981).
 

 The term “agent” in § 302(a)(2) has customarily been interpreted fairly broadly,
 
 see Grove Press, Inc. v. Anglelon,
 
 649 F.2d 121, 122 (2d Cir.1981), and has been held to include co-conspirators,
 
 see, e.g., American Broad,. Co. v. Hernreich,
 
 338 N.Y.S.2d 146, 148, 40 A.D.2d 800, 801 (N.Y.A.D.1972);
 
 Cleft of the Rock Found. v. Wilson,
 
 992 F.Supp. 574, 581 (E.D.N.Y.1998);
 
 Chrysler Capital Corp. v. Century Power Corp.,
 
 778 F.Supp. 1260, 1266 (S.D.N.Y.1991)
 
 (citing Lehigh Valley Indus., Inc. v. Birenbaum,
 
 389 F.Supp. 798, 806-07 (S.D.N.Y.1975),
 
 aff'd,
 
 527 F.2d 87 (2d Cir.1975)). “[Ajcts committed in New York by the co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under CPLR 302(a)(2).”
 
 Id.; see Andre Emmerich Gallery, Inc. v. Segre,
 
 No. 96 Civ. 889(CSH), 1997 WL 672009, at *5-6 (S.D.N.Y. Oct.29,1997).
 

 
 *446
 
 To establish jurisdiction over a nonresident defendant on the basis of the New York acts of a co-conspirator, the plaintiff must: (1) establish a prima facie case of conspiracy; (2) allege specific facts warranting the inference that the defendant was a member of the conspiracy; and (3) demonstrate the commission of an overt act in New York during, and pursuant to, the conspiracy.
 
 See Allstate Life Ins. Co. v. Linter Group Ltd.,
 
 782 F.Supp. 215, 221 (S.D.N.Y.1992);
 
 Chrysler Capital,
 
 778 F.Supp. at 1266.
 

 Under New York law, a prima facie showing of a conspiracy requires allegation of a primary tort and four additional elements: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the parties’ intentional participation in the furtherance of a plan or purpose; and (4) resulting damage or injury.
 
 See Chrysler Capital,
 
 778 F.Supp. at 1267
 
 (citing Kashi v. Gratsos,
 
 790 F.2d 1050, 1055 (2d Cir.1986)).
 

 The requisite relationship between the defendant and its New York co-conspirators is established by a showing that “(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted ‘at the direction or under the control,’ or ‘at the request of or on behalf of the out-of-state defendant.”
 
 Chrysler Capital,
 
 778 F.Supp. at 1268-69
 
 (quoting Dixon v. Mack,
 
 507 F.Supp. 345, 350 (S.D.N.Y.1980)).
 

 A plaintiff ultimately bears the burden of establishing jurisdiction over a defendant by a preponderance of the evidence.
 
 See Ball v. Metallurgie Hoboken-Overpelt, S.A.,
 
 902 F.2d 194, 197 (2d Cir.1990);
 
 Levisohn, Lerner, Berger & Langsam,
 
 10 F.Supp.2d at 338-39. With respect to proving a civil conspiracy, Best Cellars’ evidentiary burden is more specifically set forth as follows:
 

 As persons do not generally proclaim to the world their evil intentions and designs a conspiracy can rarely be established by direct proof; the law is not insensible to this problem and it recognizes realities; it therefore permits a conspiracy to be shown by circumstantial evidence. This is but a rule of necessity; even so, neither conjecture, surmise, nor suspicion can take the place of evidence. The rule carries no such implication or dispensation and tbe rule permitting proof of a conspiracy by means of circumstantial evidence is but the adoption of a formula that if from an established set of circumstances a fair and reasonable inference or deduction may be drawn as indicating the existence of a fact, it may be considered as proof of the fact.
 

 Cooper v. Maurer,
 
 37 N.Y.S.2d 992, 996 (N.Y.Sup.Ct.1942);
 
 see also Cofacredit, S.A. v. Windsor Plumbing Supply Co.,
 
 187 F.3d 229, 240 (2d Cir.1999) (“As is true in criminal conspiracies, agreements in civil conspiracies will not easily be shown by direct evidence, but may be inferred from circumstantial evidence.”).
 

 Best Cellars has alleged a conspiracy between all defendants with respect to each cause of action for which Best Cellars seeks preliminary injunctive relief: trade dress infringement under the Lanham Act, trade dress dilution, unfair competition under New York law, federal copyright infringement, and breach of confidentiality. The specific in-state tortious acts alleged to have furthered this conspiracy are as follows:
 

 1. Mazur regularly visited the Best Cellars store while living in'New York and attending Columbia Business School. He also visited the store after moving to Virginia. During these trips he took certain brochures, which were later copied.
 

 2. Mazur sent Adamstein to look at the Best Cellars store in New York to copy its design.
 

 
 *447
 
 B. Jack Mazur visited the Best Cellars New York store and bought a case of wine.
 

 4. Campbell visited the Best Cellars New York store three separate times, including at least once after he was associated with Grape Finds, when he came to look at the design.
 

 5. Green faxed confidential information from New’ York to the Grape Finds partners, including confidential elements from Best Cellars’ private placement memorandum relating to its subscription agreement and shareholder agreement.
 

 There is sufficient circumstantial evidence to support a finding of a conspiracy between Mazur, Jack Mazur, Adamstein, Campbell, Green, GFI, and GFDI with respect to the causes of action for trade dress infringement, trade dress dilution, unfair competition, and copyright infringement. As found above, there was a meeting of the minds of these persons to replicate the look and feel of the Best Cellars stores.
 

 Moreover, the trade dress of the Grape Finds store was not completed on May 12, 1999, simply because that was the date on which A & D delivered to Grape Finds a set of blueprints and drawings. It was not until June 1, 1999, that Adamstein, Mazur, and Jack Mazur met with Jack Anderson in Seattle to discuss Hornall Anderson’s work on the store. Other evidence confirms that work on the trade dress continued after both Campbell and Green had joined the Grape Finds team. Given Green’s prior involvement with Best Cellars — including the circumstances under which he had been terminated — and Campbell’s admission that, after joining Grape Finds, he visited the Best Cellars New York store at least in part in order to look at the design, there has been a sufficient showing that both Green and Campbell joined in the conspiracy with respect to the trade dress, and that Campbell, at least, committed an overt act in New York in furtherance of the conspiracy.
 

 It is also doubtful that Jack Mazur visited the New York Best Cellars store simply in order to purchase a case of wine. Viewing the evidence in its totality, each visit to the New York store by Adamstein or any other defendant was made — at least in part — for the purpose of viewing the trade dress and returning to Washington to discuss how it could be incorporated into the Grape Finds store.
 

 Furthermore, while the chronology is not entirely clear from the hearing, the conspiracy to copy Best Cellars’ trade dress overlaps with the ongoing conspiracy to copy Best Cellars’ copyrighted brochure by Green, Campbell, Mazur, and Grape Finds. Mazur, Campbell, and Green worked on the Grape Finds website, and it is hardly conceivable that they would not have known of the extent of their copying. It can also be inferred that at least one of those defendants picked up a Best Cellars brochure after the formation of the conspiracy for the purpose of copying.
 

 The same facts support a finding that the parties intentionally participated in the conspiracies. The resulting damage or injury is established forthwith in the section of this opinion discussing the merits of the trade dress infringement claim.
 

 GFI and GFDI, through the actions and knowledge of their principals, were aware of the effect in New York of the conspiracies, and the acts committed in New York were for, and were done for, the actors’ own benefit and for the benefit of GFI and GFDI.
 

 Since sufficient facts warranting the inference of a conspiracy by and between Mazur, Campbell, GFI, and GFDI have been demonstrated, and specific acts in furtherance of that conspiracy have been carried out in New York, this Court has, under N.Y. C.P.L.R. § 302(a)(2), personal jurisdiction over such defendants with respect to Best Cellars’ trade dress infringement, trade dress dilution, unfair competition, and copyright infringement claims.
 

 
 *448
 
 On the other hand, the' evidence does not support a claim of conspiracy to induce Hornall Anderson and Green to violate their confidentiality agreements. The Court thus lacks jurisdiction over defendants Mazur, Campbell, GFI, and GFDI with respect to the breach of confidentiality claim.
 

 In addition, Best Cellars has not established any facts permitting an inference that any corrupt agreement existed between Hornall Anderson and the other defendants.
 
 [8]
 
 Moreover, even if such an agreement were deemed to exist, the instate acts performed subsequent to Hor-nall Anderson’s engagement with Grape Finds — the trips to view Best Cellars and Green’s faxing of confidential documents— were neither for Hornall Anderson’s benefit nor under its control. Thus, § 302(a)(2) does not provide jurisdiction over Hornall Anderson for the causes of action sounding in trade dress infringement, trade dress dilution, unfair competition under New York law, and copyright infringement.
 

 c.
 
 302(a)(3)
 

 C.P.L.R. § 302(a)(3) requires commission of a tortious act outside New York State which causes injury within the State. Additionally, under the prong. of § 302(a)(3)(H), the defendant must expect that the tort will have consequences in the State, and the defendant must derive substantial revenue from interstate commerce.
 

 Section 302(a)(3) does not provide a basis for jurisdiction over Grape Finds, Ma-zur, Campbell, or Green. No showing has been made that any of these defendants derive substantial revenue from interstate commerce. The only evidence presented by Best Cellars in support of such a finding was Mazur’s admission that some Grape Finds customers came from Virginia and Maryland. In spite of the likelihood of such sales, however, the Grape Finds operation is essentially — at the present time — of a “local character.”
 
 Bensu-san,
 
 126 F.3d at 29 (internal quotation marks omitted). Grape Finds only has a license to sell alcoholic beverages in Washington, D.C., and it is precluded from using the mails to make sales to non-D.C. residents.
 

 Thus, § 302(a)(3)(ii) does not provide a basis for asserting jurisdiction.
 

 2.
 
 Due Process
 

 The exercise of personal jurisdiction under a state long-arm statute comports with constitutional due process only if the defendant has “certain minimum contacts with [the forum] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.”
 
 International Shoe Co. v. Washington,
 
 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (citation and internal quotation marks omitted);
 
 accord Calder v. Jones,
 
 465 U.S. 783, 788, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984);
 
 World-Wide Volkswagen Corp. v. Woodson,
 
 444 U.S. 286, 292, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980);
 
 Chew v. Dietrich,
 
 143 F.3d 24, 28 (2d Cir.1998). Having given due consideration to all factors relevant to this inquiry,
 
 see Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,
 
 84 F.3d 560, 567-69 (2d Cir.1996), the Court finds that the assertion of personal jurisdiction over the individual defendants would not offend the standards of due process.
 

 For these reasons, the motions to dismiss for lack of personal jurisdiction are granted in part and denied in part.
 

 B.
 
 Venue
 

 The Court has considered the arguments for dismissing the action for improper venue, or, in the alternative, for transferring venue, and finds that neither dismissal nor transfer is warranted in light
 
 *449
 
 of the legal standard and the evidence set forth during the hearing.
 

 II.
 
 A Preliminary Injunction Will Issue
 

 A.
 
 The Standard For Grant of a Preliminary Injunction
 

 The standard for granting a preliminary injunction in this circuit is “(1) a showing of irreparable injury and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and the balance of hardships tipping in favor of the movant.”
 
 Civic Ass’n of the Deaf v. Giuliani,
 
 915 F.Supp. 622, 631 (S.D.N.Y.1996)
 
 (citing Blum v. Schlegel,
 
 18 F.3d 1005, 1010 (2d Cir.1994));
 
 see also Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.,
 
 111 F.3d 993, 998-99 (2d Cir.1997).
 

 Best Cellars seeks a preliminary injunction on its Lanham Act claim for trade dress infringement, its dilution claim, and its unfair competition claim under New York law. It also seeks to enjoin Defendants’ infringements of its copyright as well as misuse of its confidential information.
 

 B.
 
 Trade Dress Infringement and Unfair Competition
 

 1.
 
 Irreparable Harm
 

 In a case involving allegations of infringement of trade dress under the Lanham Act, 15 U.S.C. § 1125, irreparable harm is presumed if the plaintiff can demonstrate a likelihood of success on the merits of the infringement claim.
 
 See Fun-Damental Too,
 
 111 F.3d at 999. In such actions, a finding of likelihood of confusion between the trade dresses in question generally provides sufficient grounds for issuance of a preliminary injunction, without further evidence of actual injury.
 
 See id.; American Cyanamid Co. v. Campagna per le Farmacie in Italia S.P.A,
 
 847 F.2d 53, 55 (2d Cir.1988) (showing of likelihood of confusion as to source or sponsorship establishes both likelihood of success and risk of irreparable harm). For the reasons set forth below, a likelihood of confusion has been demonstrated in this case, thereby establishing sufficient risk of irreparable injury.
 

 2.
 
 Best Cellars Has Demonstrated A Likelihood of Success on the Merits of Its Trade Dress and Unfair Competition Claims
 

 a.
 
 Trade Dress Infringement
 

 Section 43(a) of the Lanham Act provides in pertinent part:
 

 (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
 

 (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ...
 

 shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.
 

 15 U.S.C. § 1125(a).
 

 “Section 43(a) ... ‘[tjhough enacted as part of the Trademark Act, ... functions as a federal law of unfair competition for unregistered goods ... [and] extends protection to a product’s “trade dress.” ’ ”
 
 Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,
 
 58 F.3d 27, 31 (2d Cir.1995)
 
 (quoting Coach Leatherware Co. v. AnnTaylor, Inc.,
 
 933 F.2d 162, 168 (2d Cir.1991)).
 

 Trade dress has a broad meaning, and includes “all elements making up the total visual image by which [a] product is presented to customers, ... ‘as defined by its
 
 *450
 
 overall composition and design, including size, shape, color, texture, and graphics.’ ”
 
 Id. (quoting AnnTaylor,
 
 933 F.2d at 168);
 
 see also Two Pesos, Inc. v. Taco Cabana, Inc.,
 
 505 U.S. 763, 764 n. 1, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992);
 
 LeSportsac, Inc. v. K Mart Corp.,
 
 754 F.2d 71, 75 (2d Cir.1985). For example, the Supreme Court in
 
 Two Pesos
 
 upheld a federal district court’s finding that a Mexican restaurant was entitled to protection under § 43(a) for a trade dress consisting of
 

 a festive eating atmosphere having interior dining and patio areas decorated with artifacts, bright colors, paintings and murals. The patio includes interior and exterior areas with the interior patio capable of being sealed off from the outside patio by overhead garage doors. The stepped exterior of the building is a festive and vivid color scheme using top border paint and neon stripes. Bright awnings and umbrellas continue the theme.
 

 Two Pesos,
 
 505 U.S. at 765, 112 S.Ct. 2753
 
 (quoting Taco Cabana, Intern., Inc. v. Two Pesos, Inc.,
 
 932 F.2d 1113, 1117 (5th Cir. 1991)).
 

 The public policy rationale for trade dress protection is explained in- the
 
 Two Pesos
 
 opinion as follows:
 

 Protection of trade dress, no less than of trademarks, serves the [Lanham] Act’s purpose to “secure to the owner of the mark the goodwill of his business and to protect the ability of consumers to distinguish among competing producers. National protection of trademarks is desirable, Congress concluded, because trademarks foster competition and the maintenance of quality by securing to the producer the benefits of good reputation.”
 

 Id.
 
 at 774, 112 S.Ct. 2753 (1992)
 
 (quoting Park ‘N Fly, Inc. v. Dollar Park and Fly, Inc.,
 
 469 U.S. 189, 198, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985)). The
 
 Two Pesos
 
 decision resolved a conflict between the circuit courts by holding that an inherently distinctive trade dress can be protected under § 43(a) of the Lanham Act notwithstanding lack of proof of secondary meaning.
 
 See Two Pesos,
 
 505 U.S. at 776, 112 S.Ct. 2753.
 
 [9]
 
 Among the factors which led the Court to its decision were certain policy considerations going directly to the heart of the instant case:
 

 [A]dding a secondary meaning requirement could have anticompetitive effects, creating particular burdens on the start-up of small companies. It would présent special difficulties for a business ... that seeks to start a new product in a limited area and then expand into new markets. [It] would allow a competitor, which has not adopted a distinctive trade dress of its own, to appropriate the originator’s dress in other markets and to deter the originator from expanding into and competing in these areas.
 

 Id.
 
 at 775, 112 S.Ct. 2753.
 

 At the other end of the spectrum, of course, are competing concerns. “[0]ve-rextension of trade dress protection can undermine restrictions in copyright and patent law that are designed to avoid monopolization of products and ideas.”
 
 Jeffrey Milstein,
 
 58 F.3d at 32.
 

 To establish a claim of trade dress infringement under § 43(a), a plaintiff must demonstrate (1) “that its trade dress is
 
 either
 
 inherently distinctive
 
 or
 
 that it has acquired distinctiveness through a secondary meaning,” (2) “that there is a likelihood of confusion between defendant’s trade dress and plaintiffs,”
 
 Fun-Damental Too,
 
 111 F.3d at 999
 
 (citing Two Pesos,
 
 505 U.S. at 769-70, 112 S.Ct. 2753);
 
 see also Jeffrey Milstein,
 
 58 F.3d at 31, and (3) where, as here, the dress has not been registered, that the design is non-function
 
 *451
 
 al.
 
 See
 
 15 U.S.C. § 1125(a)(3).
 
 [10]
 

 i.
 
 Best Cellars’ Trade Dress Is Inherently Distinctive
 

 The inherent distinctiveness of a trademark or trade dress is evaluated under the test set forth by Judge Friendly in
 
 Abercrombie & Fitch Co. v. Hunting World, Inc.,
 
 537 F.2d 4, 9 (2d Cir.1976).
 
 See Fun-Damental Too,
 
 111 F.3d at 999-1000;
 
 Jeffrey Milstein,
 
 58 F.3d at 31. Under the
 
 Abercrombie
 
 test,
 

 trade dress is classified on a spectrum of increasing distinctiveness as generic, descriptive, suggestive, or arbitrary/fanciful. Suggestive and arbitrary or fanciful trade dress are deemed inherently distinctive and thus always satisfy the first prong of the test for protection. A descriptive trade dress may be found inherently distinctive if the plaintiff establishes that its mark has acquired secondary meaning giving it distinctiveness to the consumer. A generic trade dress receives no Lanham Act protection.
 

 Fun-Damental Too,
 
 111 F.3d at 1000
 
 (citing Two Pesos,
 
 505 U.S. at 768-69, 112 S.Ct. 2753). “Although each element of a trade dress individually might not be inherently distinctive, it is the combination of elements that should be the focus of the distinctiveness inquiry. Thus, if the overall dress is arbitrary, fanciful, or suggestive, it is distinctive despite its incorporation of generic [or functional] elements.”
 
 Jeffrey Milstein,
 
 58 F.3d at 32. Because there is a “virtually unlimited” number of ways to combine elements to make up the total visual image that constitutes a trade dress, “a product’s trade dress typically will be arbitrary or fanciful and meet the inherently distinctive requirement for § 43(a) protection.”
 
 Fun-Damental Too,
 
 111 F.3d at 1000
 
 (citing Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.,
 
 65 F.3d 1063, 1069 (2d Cir.1995);
 
 Chevron Chem. Co. v. Voluntary Purchasing Groups, Inc.,
 
 659 F.2d 695, 703 (5th Cir.1981)).
 
 [11]
 

 On the other hand, “an idea, a concept, or a generalized type of appearance” cannot be protected under trade dress law, although “the concrete expression of an idea in a trade dress has received protection.”
 
 Jeffrey Milstein,
 
 58 F.3d at 32-33 (citing cases). This can be a difficult distinction to draw, and in doing so “a helpful consideration will be the purpose of trade dress law: to protect an owner of a dress in informing the public of the source of its products, without permitting the owner to exclude competition from functionally similar products.”
 
 Id.
 
 at 33.
 

 Best Cellars has met its burden under the standard for a preliminary injunction, set forth above, of establishing the inherent distinctiveness of its trade dress. Under the
 
 Abercrombie
 
 analysis, the trade dress of Best Cellars is arbitrary. This arbitrary trade dress consists of the total visual image which a customer entering a Best Cellars store encounters — an image that was acknowledged as unique by both Mazur and Adamstein in their testimony. As described above in the “Facts” section of this opinion, a huge number of articles written about the Best Cellai’s stores have focused on the distinctiveness of their look. The unique design — both the architectural component and the graphical component— has been further acknowledged in numerous awards. The point does not need to be belabored; the Best Cellars stores look like no other wine stores.
 
 [12]
 
 Best Cellars achieved its goal of designing an “anti-wine store.” As such, the trade dress is not
 
 *452
 
 suggestive of the product being sold, let alone descriptive or generic.
 

 Best Cellars sets forth fourteen specific elements which it believes constitute the uniqueness of its trade dress: (1) eight words differentiating taste categories; (2) eight colors differentiating taste categories; (3) eight computer-manipulated images differentiating taste categories; (4) taste categories set above display fixtures by order of weight; (5) single display bottles set on stainless-steel wire pedestals; (6) square 4”x4” shelf talkers with text arranged by template; (7) shelf talkers positioned at eye level, below each display bottle; (8) bottles vertically aligned in rows of nine; (9) storage closets located beneath vertically aligned bottles; (10) materials palette consisting of light wood and stainless steel; (11) mixture of vertical racks and open shelving display fixtures; (12) no fixed aisles; (13) bottles down and back-lit; and (14) limited selection (approximately 100) of value-priced wines.
 

 The essence of the look, however, is the “wall of wine,” i.e., the color-coded, ieono-graphic wall signs identifying eight taste categories above single display bottles on stainless-steel wire pedestals which run along the store perimeter, above identical color-coded textually formatted square shelf-talkers, above vertical arrays of nine glowing bottles stacked horizontally, above a strip of cabinets or drawers which extend to the floor.
 

 Defendants put forth several reasons why Best Cellars’ trade dress is not inherently distinctive, but none is compelling. First, Defendants maintain that Best Cellars has failed to meet its burden of demonstrating that its trade dress is non-functional.
 
 See
 
 15 U.S.C. § 1125(a)(3). A feature of a trade dress is functional when it is “ ‘essential to the use or purpose of the article or if it affects the cost or quality of the article,’ that is, if the exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage.”
 
 Qualitex Co. v. Jacobson Prods. Co.,
 
 514 U.S. 159, 165, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995)
 
 (quoting Inwood Lab., Inc. v. Ives Lab., Inc.,
 
 456 U.S. 844, 850 n. 10, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982));
 
 see Fun-Damental Too,
 
 111 F.3d at 1002 (functionality requires showing that “the features in question are essential to effective competition in a particular market”)
 
 (citing Landscape Forms, Inc. v. Columbia Cascade Co.,
 
 70 F.3d 251, 253 (2d Cir.1995)). “[T]he fact that a trade dress is composed
 
 exclusively
 
 of commonly used or functional elements might suggest that that dress should be regarded as unprotectable or ‘generic,’ to avoid tying up a product or marketing idea.”
 
 Jeffrey Milstein,
 
 58 F.3d at 32 (emphasis added).
 

 Under this legal standard, it is unnecessary to examine laboriously, and in detail, each element of Best Cellars’ claimed trade dress in order to make a determination of non-functionality. During Trim-ble’s testimony, exhibits were introduced of the numerous different potential wine display systems under consideration for the Best Cellars store. All of these systems would have been viable ways to display the wine. Best Cellars’ exclusive use of, for instance, single display bottles set on stainless-steel wire pedestals (element five), and bottles vertically aligned in rows of nine (element eight), would hardly place competitors at a “significant non-reputation-related disadvantage.”
 
 Qualitex,
 
 514 U.S. at 165, 115 S.Ct. 1300. Competitors could place single display bottles on solid stainless-steel pedestals, on brass pedestals, on wooden pedestals, and so forth. Vertical alignment could be in rows of six, nine, twelve, or any other number. While there is an ergonomic factor involved— bottles going all the way to the floor would require stooping, while bottles above eye-level would require reaching — the lowest bottles in a nine-bottle vertical array still require stooping, and arguably a vertical array of six, seven, or even eight bottles would be ergonomically superior. Moreover, there is nothing inherently functional about a vertical array of identical bottles of
 
 *453
 
 wine to begin with. There are countless examples of wine stores which do not use vertical arrays; indeed, many of the design ideas generated by Rockwell in the planning stages involved non-vertical arrays. In fact, many of the elements of Best Cellars’ trade dress, while containing arguably functional components, contain equally non-functional components.
 

 In any event, Best Cellars has made a sufficient showing that at least some of the elements of its trade dress are not commonly used or functional, which is all that is required under the law.
 
 See Jeffrey Milstein,
 
 58 F.3d at 32.
 

 Defendants next allege that even if the individual elements are non-functional, the totality of Best Cellars’ trade dress is functional. In support of this rather illogical proposition, Defendants cite
 
 Jeffrey Milstein,
 
 58 F.3d at 32,
 
 Walt Disney Co. v. Goodtimes Home Video Corp.,
 
 830 F.Supp. 762, 766 (S.D.N.Y.1993), and
 
 Hampton Inns, Inc. v. Ameritel Inns, Inc.,
 
 No. 93-459-S-BLW, 1995 WL 762148 (D.Idaho Oct. 19, 1995). However,
 
 Jeffrey Milstein
 
 stands for a nearly opposite proposition,
 
 see Jeffrey Milstein,
 
 58 F.3d at 32 (“[I]f the overall dress is arbitrary, fanciful, or suggestive, it is distinctive despite its incorporation of generic elements.”), while
 
 Walt Disney
 
 found functionality precisely
 
 because
 
 each element of the purported trade dress was found to be “purely functional.”
 
 Walt Disney,
 
 830 F.Supp. at 770.
 
 Hampton Inns
 
 is a district court case from Idaho construing Ninth Circuit law, involving a far more generic trade dress than the one claimed by Best Cellars.
 
 See Hampton Inns,
 
 1995 WL 762148, at *23.
 

 Defendants next allege that Best Cellars has not consistently applied its trade dress. While there is legal support for the proposition that a trade dress must be consistently applied in order to merit protection,
 
 see, e.g., Regal Jewelry Co. v. Kingsbridge Intern., Inc.,
 
 999 F.Supp. 477, 486 (S.D.N.Y.1998);
 
 Walt Disney,
 
 830 F.Supp. at 768, the evidence indicates that the trade dress has been consistently applied in the three Best Cellars stores. The changes emphasized by Defendants' — the location of the cash wrap, the change in the size and shape of the wall signs, the wall refrigerator, and so forth — are insignificant and do not change the overall look and feel established in the prototype New York store. The “wall of wine” remains the dominant visual element in all three stores.
 

 Defendants are correct that Best Cellars cannot protect under trade dress law its concept of selling wine by taste. However, protection is possible for the “concrete expression” of the concept in the trade dress that Best Cellars has developed.
 
 Jeffrey Milstein,
 
 58 F.3d at 33.
 

 Finally, Defendants maintain that Best Cellars cannot show that it has developed secondary meaning in its trade dress. However, as a matter of law, of course, such a showing is not required if inherent distinctiveness has been shown, as it has been in this case.
 
 See Two Pesos,
 
 505 U.S. at 769, 112 S.Ct. 2753.
 

 ii.
 
 There Is a Substantial Likelihood of Confusion Between the Trade Dresses of Best Cellars and Grape Finds
 

 Courts in this Circuit apply an eight-factor test, drawn from
 
 Polaroid Corp. v. Polarad Electronics Corp.,
 
 287 F.2d 492 (2d Cir.1961), to determine the likelihood of confusion between the trade dress of two competitors:
 

 (1) the strength of the plaintiffs trade dress, (2) the similarity between the two trade dress, (3) the proximity of the products in the marketplace, (4) the likelihood that the prior owner will bridge the gap between the products, (5) evidence of actual confusion, (6) the defendant’s bad faith, (7) the quality of defendant’s product, and (8) the sophistication of the relevant consumer group.
 

 Fun-Damental Too,
 
 111 F.3d at 1002-03;
 
 *454
 

 see Polaroid,
 
 287 F.2d at 495.
 
 [13]
 
 While the factors are meant to be a guide, the inquiry ultimately hinges on whether an ordinarily prudent person would be confused as to the source of the allegedly infringing product. Here, that inquiry can be put as follows: is there a substantial likelihood that an ordinarily prudent consumer would, when standing in the Grape Finds store, think he was standing in a Best Cellars store? As the eight-factor analysis below will demonstrate, the answer to that question, weighing the facts in the context of a preliminary injunction hearing, is yes.
 

 1.
 
 Strength of the Trade Dress
 

 The strength of a trade dress or trademark is measured in terms of its distinctiveness, “or more precisely, [by] its tendency to identify the goods sold ... as emanating from a particular ... source.”
 
 McGregor-Doniger Inc. v. Drizzle Inc.,
 
 599 F.2d 1126, 1131 (2d Cir.1979);
 
 see Sports Authority, Inc. v. Prime Hospitality Corp.,
 
 89 F.3d 955, 960-61 (2d Cir.1996). It is “ ‘an amorphous concept with little shape or substance when divorced from the mark’s [or dress’s] commercial context.’”
 
 McGregor-Doniger,
 
 599 F.2d at 1133
 
 (quoting E.I. DuPont de Nemours & Co. v. Yoshida Int’l, Inc.,
 
 393 F.Supp. 502, 512 (E.D.N.Y.1975)). “The strength or distinctiveness of a mark [or dress] determines both the ease with which it may be established ... and the degree of protection it will be accorded.”
 
 Id.
 
 at 1131.
 

 Arbitrary dress is by its very nature distinctive and strong.
 
 See Procter & Gamble Co. v. Johnson & Johnson, Inc.,
 
 485 F.Supp. 1185, 1196 (S.D.N.Y.1979),
 
 aff'd,
 
 636 F.2d 1203 (2d Cir.1980). However, this strength may be diminished by the existence of similar dresses used in connection with similar products.
 
 See Vision, Inc. v. Parks,
 
 610 F.Supp. 927, 931 (S.D.N.Y.1985). Dresses that lack distinctiveness and fall on the lower end of the scale are classified as weak and are entitled to limited scope of protection.
 
 See Aris-Isotoner Gloves, Inc. v. Fownes Bros.,
 
 594 F.Supp. 15, 21 (S.D.N.Y.1983). For instance, generic marks are not enti-
 
 *455
 
 tied to protection under the Lanham Act.
 
 See Sports Authority,
 
 89 F.3d at 961. “Marks that are descriptive are entitled to protection only if they have acquired a ‘secondary meaning’ in the marketplace.”
 
 Genesee Brewing Co. v. Stroh Brewing Co.,
 
 124 F.3d 137, 143 (2d Cir.1997). Additionally, “|w]hen determining whether either a suggestive or descriptive mark is a strong one for purposes of the
 
 Polaroid
 
 inquiry, we look to the secondary meaning that the mark has acquired, because the ultimate issue to be decided is the mark’s” “‘origin-indicating quality, in the eyes of the purchasing public.’ ”
 
 Sports Authority,
 
 89 F.3d at 961
 
 (quoting Lang v. Retirement Living Publ’g Co.,
 
 949 F.2d 576, 581 (2d Cir.1991)
 
 (quoting McGregor-Doniger,
 
 599 F.2d at 1131)).
 

 A secondary meaning is acquired when “it [is] shown that the
 
 prima-ry
 
 significance of the term in the minds of the consuming public is not the product but the producer.”
 
 Centaur Communications, Ltd. v. A/S/M Communications, Inc.,
 
 830 F.2d 1217, 1221 (2d Cir.1987) (internal quotations omitted);
 
 see Genesee Brewing,
 
 124 F.3d at 143 n. 4. “The crux of the doctrine of secondary meaning is that the mark comes to identify not only the goods but the source of those goods....”
 
 Centaur,
 
 830 F.2d at 1221 (internal quotations omitted). Still, the party seeking to establish secondary meaning must show that “the purchasing public associates goods designated by a particular mark with but a single — although anonymous — source.”
 
 Id.
 
 Factors relevant for assessing secondary meaning include “ ‘(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and, (6) length and exclusivity of the mark’s use.’ ”
 
 Genesee Brewing,
 
 124 F.3d at 143 n. 4
 
 (quoting Centaur,
 
 830 F.2d at 1222).
 

 Under this standard, Best Cellars’ trade dress is quite strong. As set forth above, the dress is best classified as “arbitrary” under the
 
 Abercrombie
 
 analysis. Moreover, there is no similar dress used in connection with the retail sale of wine. Finally, although it is not required here in order to find that the dress is strong, there is evidence that the dress has acquired secondary meaning. While there is no evidence of advertising expenditures or customer studies linking the dress to a source, there has been an abundance of unsolicited media coverage of Best Cellars, there is demonstrated sales success, and the dress has been exclusively used by Best Cellars since the fall of 1996. Also, as set forth below, the Grape P’inds trade dress involves a deliberate attempt to copy the Best Cellars dress. These facts provide at least some evidence of secondary meaning. In sum, Best Cellars’ trade dress is quite strong.
 

 2.
 
 Similarity Between The Trade Dresses
 

 The degree of similarity factor looks to whether it is probable that the similarity of the dresses will cause confusion among numerous customers who are ordinarily prudent.
 
 See Morningside Group Ltd. v. Morningside Capital Group, L.L.C.,
 
 182 F.3d 133, 140 (2d Cir.1999). “The presence and prominence of markings tending to dispel confusion as to the origin, sponsorship or approval of the goods in question is highly relevant to an inquiry concerning the similarity of the two dresses. When prominently displayed it can go far towards ... countering any suggestion of consumer confusion arising from any of the other
 
 Polaroid
 
 factors.”
 
 Bristol-Myers Squibb Co. v. McNeil-P.P.C. Inc.,
 
 973 F.2d 1033, 1046 (2d Cir.1992). However, when the trade names are not so recognizable, the prominence of their display carries less weight.
 
 See Fun-Damental Too,
 
 111 F.3d at 1003.
 

 As described above, the dominant visual element of both the Best Cellars and the Grape Finds store is the wall of wine. Neither the vaulted ceiling, nor the exteri- or, nor the cork floor, nor the multi-pur-pose cubes, nor the steel racking system,
 
 *456
 
 nor any other difference in the Grape Finds store, significantly modifies the overall visual effect achieved by merchandising the eight categories of wines almost exclusively along the perimeter walls of the store, with display bottles set at a uniform height, identical shelf talkers, nine bottles lying on their side in a vertical array, wall signs above and cabinets below. While the Grape Finds trade name is displayed both outside and inside the store, the name is not recognizable and thus carries less weight. In. sum, the evidence demonstrates a significant probability that numerous ordinarily prudent customers in the Grape Finds store will be confused as to whether they are, in fact, in a Best Cellars store.
 

 3.
 
 The Proximity of the Products
 

 “The ‘proximity-of-the-products’ inquiry concerns whether and to what extent the two products compete with each other.”
 
 Cadbury Beverages, Inc. v. Cott Corp.,
 
 73 F.3d 474, 480 (2d Cir.1996). The court must consider “ ‘the nature of the products themselves and the structure of the relevant market,’ ” including “the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold.”
 
 Id. (quoting Vitarroz v. Borden, Inc.,
 
 644 F.2d 960, 967 (2d Cir.1981)).
 

 The products here are indisputably similar: value-priced bottles of wine.
 
 As
 
 for the structure of the relevant market, there are also similarities. The class of customers is nearly identical. Both stores target consumers who are not necessarily wine connoisseurs. No evidence has been presented about advertising. The channels through which the goods are sold are the stores themselves, as well as mail-order sales through the respective web sites.
 

 Moreover, while there is certainly a geographical distance between the Grape Finds store in Washington, D.C. and the nearest Best Cellars store in Manhattan, Best Cellars has already received nationwide recognition of its product and conducts mail-order sales in many states. More crucially, it is undisputed that both Grape Finds and Best Cellars envision a “national rollout” of stores. For Best Cellars, of course, this rollout has already begun, with the Brookline and Seattle stores. Best Cellars was also very close to opening a store in Washington, D.C., and refrained from doing so at least in part because of the opening of the Grape Finds store and this anticipated litigation. “A strong possibility that either party will expand his business to compete with the other or be marketed to the same consumers will weigh in favor of finding that the present use is infringing.”
 
 Daddy’s Junky Music Stores, Inc. v. Big Daddy’s Family Music Center,
 
 109 F.3d 275, 287 (6th Cir. 1997) (citations and internal quotation marks omitted).
 

 In sum, there is considerable proximity between the products.
 

 4.
 
 Bridging the Gap
 

 “The issue here is whether the two companies are likely to compete directly in the same market.”
 
 Charles of the Ritz Group v. Quality King Distribs., Inc.,
 
 832 F.2d 1317, 1322 (2d Cir.1987). This factor applies when the first user sells its products in one field and the second user sells its products in a closely related field, into which the first user might expand, thereby “bridging the gap.” Here, there is no gap to bridge: Best Cellars and Grape Finds sell the same products in the same field. This factor, therefore, also favors Best Cellars.
 

 5.
 
 Evidence of Actual Confusion
 

 Best Cellars has presented some evidence of actual confusion. Several individuals who know Wesson and Marmet informed them that a “copycat” or “knock off’ store was opening in Washington, and several customers were overheard outside the Grape Finds store remarking that it looked like a store in Brookline, while a
 
 *457
 
 customer Inside the store asked whether Grape Finds had a sister store in New York and Boston. Because no survey or other type of systematic research was conducted, however, too much weight cannot be attached to this evidence. The comments are anecdotal, and it is possible that confusion arose because the concepts— selling wine by taste — are similar.
 

 However, “it is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source.”
 
 Lois Sportswear, U.S.A. v. Levi Strauss & Co.,
 
 799 F.2d 867, 875 (2d Cir.1986);
 
 see Centaur Communications,
 
 830 F.2d at 1227. Given the very brief period of time Grape Finds was open prior to the hearing on this preliminary injunction, it is understandable that Best Cellars would not be able to gather more evidence of actual confusion.
 
 See Time Inc. Magazine Co. v. Globe Communications Corp.,
 
 712 F.Supp. 1103, 1111 (S.D.N.Y.1989). Since some evidence of actual confusion has been presented, this factor also weighs, however slightly, in favor of Best Cellars.
 

 6.
 
 Grape Finds ’ Bad Faith
 

 “This factor ‘looks to whether the defendant adopted its [dress] with the intention of capitalizing on plaintiff’s reputation and goodwill and any confusion between his and the senior user’s product.’ ”
 
 Lang v. Retirement Living Publ’g Co.,
 
 949 F.2d 576, 583 (2d Cir.1991)
 
 (quoting Edison Brothers Stores, Inc. v. Cosmair, Inc.,
 
 651 F.Supp. 1547, 1560 (S.D.N.Y.1987)).
 

 Given the overwhelming evidence of copying by Mazur of so many aspects of the Best Cellars business, it strains credulity to think that the reproduction of the trade dress — in particular, the “wall of váne” — in the Grape Finds store was not meant to capitalize on the reputation, goodwill, and any confusion between Grape Finds and Best Cellars. Neither Mazur nor Adamstein is a credible witness. Despite testimony that Mazur told Adamstein to create a wholly unique store, the actual look of the Grape Finds store, the documentation of Adamstein’s trip to New York, the complete absence of
 
 any
 
 preliminary design sketches from A & D demonstrating different approaches to the display, and the fact that
 
 numerous
 
 sketches of different approaches (for the Best Cellars display) were produced by Rockwell, lead to the conclusion that, in all probability, Mazur instructed Adamstein to reproduce for the Grape Finds store the most essential elements of Best Cellars’ trade dress, in order to capitalize on the goodwill that Best Cellars had already built and, undoubtedly, was and is continuing to build, nationwide. Grape Finds thus acted in bad faith.
 

 7.
 
 The Quality of Grape Finds’ Products
 

 No evidence has been presented that Grape Finds’ products are inferior to those of Best Cellars. This factor therefore favors Grape Finds.
 

 8.
 
 Sophistication of Purchasers
 

 This factor requires consideration of “[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods.... ”
 
 W.W.W. Pharmaceutical Co. v. Gillette Co.,
 
 984 F.2d 567, 575 (2d Cir.1993) (citation and internal quotation marks omitted).
 

 This factor also favors Best Cellars. Both stores are specifically targeting non-sophisticated wine purchasers, and the overwhelming majority of wines sold in each store are priced at the lower end of the spectrum.
 

 The
 
 Polaroid
 
 factors are non-exclusive and serve merely as a guide.
 
 See Jeffrey Milstein,
 
 58 F.3d at 34. As set forth above, in this case seven of the eight factors weigh in favor of Best Cellars. This is not a case requiring a careful balancing
 
 *458
 
 of the factors. Some factors weigh more strongly than others, but there is no doubt that, taken together, Best Cellars has made a substantial showing of a likelihood of confusion between its trade dress and that of Grape Finds.
 

 iii.
 
 Best Cellars Is Entitled to a Preliminary Injunction on its Lan-ham Act Claim
 

 Because Best Cellars has demonstrated a substantial likelihood that (1) its trade dress is distinctive, and (2) that there is a likelihood of confusion between its trade dress and the trade dress of Grape Finds, it has demonstrated that it is likely to prevail on the merits of its trade dress claim. As set forth above, because it has demonstrated a substantial likelihood of confusion, irreparable harm is assumed. Therefore, it has met the requirements for a preliminary injunction.
 

 Grape Finds will be enjoined from continuing to display its eight categories of wines in the precise configuration of its present “wall of wine,” which is the essential visual element of Best Cellars’ trade dress. It must find a way to display its wines other than by single display bottles at a uniform height around the perimeter of the store, with shelf-talkers underneath, with nine bottles lying horizontally in a vertical array. Altering its trade dress in this manner will suffice to eliminate confusion between the two stores.
 

 The other aspects of the Grape Finds store which Best Cellars has claimed are infringing do not have to be changed. Thus, the use of eight words, colors, and images to describe eight categories, of light wood and stainless steel, of open flooring, of wall signs above the display bottles and wine racks, and of a limited selection of value-priced wines can be retained.
 

 b.
 
 The Unfair Competition Claim
 

 “Under New York law, common law unfair competition claims closely resemble Lanham Act claims except insofar as the state law claim may require an additional element of bad faith or intent.”
 
 Girl Scouts v. Bantam Doubleday Dell Publ’g Group, Inc.,
 
 808 F.Supp. 1112, 1131 (S.D.N.Y.1992),
 
 aff'd,
 
 996 F.2d 1477 (2d Cir.1993)
 
 (quoting Weight Watchers Int’l, Inc. v. Stouffer Corp.,
 
 744 F.Supp. 1259, 1283 (S.D.N.Y.1990)). As set forth above, all the elements of Best Cellars’ Lanham Act claim have been met (under the standard for preliminary injunctive relief). Moreover, in the context of discussing the
 
 Polaroid
 
 factors, it was concluded that Grape Finds had exhibited the bad faith “‘misappropriation of the labors and expenditures of ” Best Cellars, which was “ ‘likely to cause confusion or deceive purchasers as to the origin of the goods.’ ”
 
 Forschner Group, Inc. v. Arrow Trading Co.,
 
 124 F.3d 402, 408 (2d Cir.1997)
 
 (quoting Jejfrey Milstein,
 
 58 F.3d at 34). Therefore, Best Cellars meets the standard for preliminary injunctive relief on its unfair competition claim as well.
 

 C.
 
 Trade Dress Dilution
 

 Best Cellars seeks injunctive relief under the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c) (“FDTA”), which reads in part:
 

 The owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person’s commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark.
 

 Dilution is defined by the statute as “[T]he lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of-(l) competition between the owner of the famous mark and other parties, or (2). likelihood of confusion, mistake, or deception.”
 
 Id.
 
 § 1127.
 

 This circuit has recently stated that in order to establish a trademark or
 
 *459
 
 trade dress dilution claim under the FDTA, a plaintiff must establish the following elements: “(1) the senior mark must be famous; (2) it must be distinctive; (3) the junior use must be a commercial use in commerce; (4) it must begin after the senior mark has become famous; and (5) it must cause dilution of the distinctive quality of the senior mark.”
 
 Nabisco, Inc. v. PF Brands, Inc.,
 
 191 F.3d 208, 215 (2d Cir.1999).
 

 The FDTA sets forth eight non-exclusive factors to consider in determining whether a mark or dress is famous: (1) the degree of inherent or acquired distinctiveness of the mark; (2) the duration and extent of use of the mark in connection with the goods; (3) the duration and extent of advertising and publicity of the mark; (4) the geographical extent of the trading area in which the mark is used; (5) the channels of trade for the goods or services with which the mark is used; (6) the degree of recognition of the mark in trading areas and channels of trade used by the mark’s owner and the person against whom the injunction is sought; (7) the nature and extent of the use of same or similar marks by third parties; and (8) whether the mark was registered under the Act as of March 3, 1881, or the Act of February 20, 1905, or on the principal register.
 
 See
 
 15 U.S.C. § 1125(c)(1);
 
 Co-nopeo, Inc. v. Cosmair, Inc.,
 
 49 F.Supp.2d 242, 258 (S.D.N.Y.1999).
 

 Best Cellars’ trade dress is undoubtedly distinctive (factor (1)) and the same or similar dress has not been used by anyone else (factor (7)). However, the dress has only been in use since late 1996. There is no evidence of advertising focusing on the dress, and most of its awards have been industry-specific (e.g., architecture, interior design). While Best Cellars is certainly famous within retail design circles, and within the retail wine world, such fame does not extend to the general public. Moreover, the geographical extent of the trading area in which the dress is used is essentially restricted to the metropolitan areas of New York City, Boston, and Seattle.
 
 [14]
 
 For the same reason, the channels of trade are different. Very little evidence has been presented regarding the degree of recognition of Best Cellars’ trade dress, beyond the anecdotal comments overheard at the Grape Finds store. Finally, Best Cellars has not registered its trade dress.
 

 On balance, the evidence presented on the eight dilution factors does not support a finding of sufficiently serious questions going to the merits of the dilution claim to warrant issuing a preliminary injunction on this claim.
 

 D.
 
 Copyright Infringement
 

 Best Cellars also seeks preliminary in-junctive relief on its claim that Grape Finds’ promotional brochure, web page, private placement memorandum, and a letter to Hornall Anderson, infringed on Best Cellars’ copyright in its promotional brochure.
 

 There are two elements to a copyright infringement claim: “(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original.”
 
 Feist Publications, Inc. v. Rural Tel, Serv. Co.,
 
 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991);
 
 accord Fonar Corp. v. Domenick,
 
 105 F.3d 99, 103 (2d Cir.1997).
 

 A certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright.
 
 See
 
 17 U.S.C. § 410(c). Best Cellars obtained copyright registration in its brochure on December 15, 1999. Since Grape Finds did not present any evidence to rebut the prima facie evidence of valid ownership, the first element required to prevail on an infringe
 
 *460
 
 ment claim is satisfied for purposes of preliminary injunctive relief.
 

 Copying can be shown by demonstrating either (a) that the defendant had access to the plaintiffs work, and that there is a substantial similarity between the defendant’s work and the protectible elements of the plaintiffs work; or (b) that the two works are “strikingly” similar.
 
 See, e.g., Kerr v. New Yorker Magazine, Inc.,
 
 63 F.Supp.2d 320, 324 (S.D.N.Y.1999). The copied portion of the work must amount to an “improper or unlawful appropriation.”
 
 Id.
 

 Mazur has admitted that he had access to both the in-store brochure and the web site of Best Cellars. Thus, Best Cellars need only demonstrate a likelihood of prevailing on the merits that there is a substantial similarity between the Grape Finds in-store brochure and equivalent material on its web page, and the protecti-ble elements of the Best Cellars in-store brochure.
 

 The leading treatise on copyright usefully distinguishes between two general types of substantial similarity: “comprehensive nonliteral similarity” and “fragmented literal similarity.”
 
 See
 
 Melville B. Nimmer & David Nimmer,
 
 Nimmer on Copyright,
 
 § 13.03[A][l]-[2], Comprehensive nonliteral similarity exists where the allegedly infringing work does not copy the original work word-for-word, but the “fundamental essence or structure of [the original] work is duplicated in [the infringing work].”
 
 Id.
 
 § 13.03[A][1]. If the only similarity is in the abstract ideas contained in both works, substantial similarity will not exist.
 
 See id.
 

 Fragmented literal similarity exists where “there is literal similarity (virtually, though not necessarily, completely word for word)” between the two works,
 
 id.
 
 § 13.03[A][2], but such literal similarity is “fragmented” — i.e., it does not exist throughout the works.
 

 Grape Finds maintains that while there are some similarities between the Best Cellars brochure and the allegedly infringing Grape Finds works, such similarities are outweighed by the differences.
 

 The Court has found, however, that while there is no comprehensive nonliteral similarity between the works, there is sufficient fragmented literal similarity to support issuing an injunction with regard to the Grape Finds brochure and the infringing work on its web site. As Best Cellars’ Exhibit 23 illustrates, Grape Finds copied extensively the descriptions from the Best Cellars brochure. Although the wording on the Grape Finds web site and in its brochure differs slightly from the wording in the Best Cellars brochure, in many instances it is virtually word-for-word and phrase-for-phrase. That the phrases do not appear in the same order, or in the same location within the brochures or on the web site, does not sufficiently distinguish the infringing works.
 

 Grape Finds also maintains that the descriptive phrases in the Best Cellars brochure are not protectible because the descriptions are clichés or stock phrases. This is simply not true, however, particularly in the context in which it has to be considered: retail wine stores.
 

 Grape Finds will thus be enjoined from continuing to use its brochure, web site, and private placement memorandum until it has altered the infringing language.
 
 [15]
 

 E.
 
 Breach of Confidentiality
 

 No evidence has been presented to support the claim that Hornall Anderson breached its confidentiality agreement with Best Cellars. Thus, Best Cellars has not demonstrated sufficiently serious ques
 
 *461
 
 tions going to the merits of this claim against Hornall Anderson.
 

 With regard to Green, while the evidence suggests that he did breach his confidentiality agreement with Best Cellars, there has been no showing of irreparable harm.
 

 For these reasons, no preliminary in-junctive relief will issue with respect to this cause of action.
 

 CONCLUSION
 

 For the reasons set forth above, a preliminary injunction will issue.
 

 Settle injunction on notice.
 

 It is so ordered.
 

 [1]
 

 . There was testimony at the hearing that everyone involved on the Best Cellars project had to sign confidentiality agreements. Presumably this included Rockwell.
 

 [2]
 

 . Although the design and layout of the shelf-lalker was done by Hornall Anderson, the text itself is created by Best Cellars. Using a computer program, Best Cellars employees can create new shell-talkers as the store rotates through different selections of wines.
 

 [3]
 

 . A "cash wrap” is a term for the area in a retail store where the retail goods are paid for and, if applicable, packaged by employees.
 

 [4]
 

 . It was incorporated under the name Grape Xpectations, Inc. On April 20, 1999, the corporate name was amended to Grape Finds, Inc.
 

 [5]
 

 . These categories, which form the heart of the Grape Finds "system,” also appear throughout Grape Finds’ promotional materials, on its web site, and in its business plan and private placement memorandum.
 

 [6]
 

 . The Grape Finds web site is also in the process of being re-vamped, although no evidence was presented concerning what changes are being made.
 

 [7]
 

 . Although Green apparently maintains a New York apartment, his current principal residence is in Washington, D.C.
 

 [8]
 

 . There is no credible evidence supporting an inference that Jack Anderson recommended copywriter Daveys to Grape Finds as part of a conspiracy between Anderson and Grape Finds to "launder” parts of Best Cellars’ trade dress or copyrighted work.
 

 [9]
 

 . In
 
 Wal-Mart,
 
 the Supreme Court has just held that the
 
 Two Pesos
 
 holding does not apply to trade dress cases involving the trade dress of a product itself, as opposed to a product's packaging.
 
 See Wal-Mart,
 
 120 S.Ct. at 1345.
 

 [10]
 

 . The Lanham Act was amended in 1999 to shift the burden of demonstrating non-functionality for an unregistered trade dress onto the party seeking relief. Previously, it had been an affirmative defense.
 

 [11]
 

 . Under this standard, many trade dresses are likely to be found to be inherently distinc-live. Fears of a slippery slope, however, are alleviated because the ease of meeting the inherent distinctiveness prong is balanced in trade dress cases by the difficulty of meeting the likelihood of confusion prong.
 

 [12]
 

 . Leaving aside Grape Finds.
 

 [13]
 

 . Best Cellars maintains that the
 
 Polaroid
 
 eight-factor test can be bypassed if there is a finding of intentional copying, which itself gives rise to a presumption of a likelihood of confusion. Yet the cases which Best Cellars cites do not wholly support this proposition. In
 
 Mobil Oil Corp. v. Pegasus Petroleum Corp.,
 
 818 F.2d 254 (2d Cir.1987), the court applied the
 
 Polaroid
 
 test, relying on evidence of intentional copying only to support a finding of bad faith (the sixth factor listed above).
 
 See id.
 
 at 258-59.
 
 Harlequin Enterprises, Ltd. v. Gulf & Western Corp.,
 
 644 F.2d 946, 949 (2d Cir.1981), and
 
 Perfect Fit Industries, Inc. v. Acme Quilting Co.,
 
 618 F.2d 950, 954 (2d Cir.1980), provide better support for the proposition, but it is doubtful whether these cases represent the current view of the law in the Second Circuit. Neither
 
 Harlequin
 
 nor
 
 Perfect Fit
 
 applies the
 
 Polaroid
 
 test. More significantly, in
 
 Fun-Damental Too,
 
 a far more recent case, the Circuit seems to indicate a far different position:
 

 It cannot automatically be inferred that intentionally copying a plaintiff's trade dress is for the purpose of deceiving or confusing consumers as to the source of the product.
 
 See
 
 Andrew C. Finch,
 
 When Imitation is the Sincerest Form of Flattery: Private Label Products and the Role of Intention in Determining Trade Dress Infringement,
 
 63 U. Chi. L.Rev. 1243, 1255 (1996). A defendant who copies his competitor’s trade dress may have valid reasons, wholly apart from a desire to confuse consumers, for doing so.
 
 See id.
 
 (noting that copying may be motivated by belief that trade dress is functional or generic, or by belief that copying is the best way to inform consumers that a generic product is a lower-priced alternative to the competitor's products). Indeed, copying in order to market a functionally equivalent alternative product might well benefit consumers, which is one of the aims of the Lanham Act.
 

 Hence, ... bad faith should not be inferred simply from the fact of copying. On the other hand, if there is additional evidence that supports the inference that the defendant sought to confuse consumers as to the source of the product, we think the inference of bad faith may fairly be drawn to support a likelihood of confusion determination.
 

 Fun-Damental Too,
 
 111 F.3d at 1005. This Court will consider intentional copying in the context of the
 
 Polaroid
 
 "bad faith” factor, not as an alternative means of reaching a "likelihood of confusion” determination.
 

 [14]
 

 . The inquiry here differs from that under the infringement claim, where a major consideration is the probability of future competition in the same geographic area. Here, the fame must already be established. It cannot be "prospective” fame.
 

 [15]
 

 . This ruling applies to Grape Finds’ original in-store brochure, which apparently is no longer in use. The ruling does not apply to the “new” Grape Finds brochure (Exh. H of Mazur Aff.). Likewise, the Court recognizes that the Grape Finds web site may at this point have been sufficiently altered so as not to constitute a continuing infringement.